```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------X
KEVIN JOHNSON,                 :
                              :          PRO SE
                              :
            Petitioner,       :     04 Civ. 7969 (HB)(THK)
                              :
      -against-               :
                              :     REPORT AND RECOMMENDATION
                              :
M. MAHER,                      :
                              :
            Respondent.       :
------------------------------X
```

**TO:   HON. HAROLD BAER, UNITED STATES DISTRICT JUDGE.**
**FROM: THEODORE H. KATZ, UNITED STATES MAGISTRATE JUDGE.**

This habeas corpus proceeding was referred to this Court for a Report and Recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and Rule 72.1(d) of the Local Civil Rules of the Southern District of New York.

Petitioner, a New York State prisoner, was convicted in New York State Supreme Court, New York County, of two counts of Robbery in the First Degree (New York Penal Law § 160.15(4)), and two counts of Robbery in the Second Degree (New York Penal Law § 160.10). Petitioner was sentenced to determinate prison terms of twelve years on each count of first-degree robbery and determinate terms of ten years for each count of second-degree robbery, with all sentences to run concurrently.

Petitioner now seeks habeas relief pursuant to 28 U.S.C. § 2254, claiming: 1) his Miranda rights were violated when incriminating statements made after he had invoked his right to remain silent were admitted at trial; 2) the prosecutor's

unsupported insinuations during summation violated his right to a fair trial; 3) the photographic array from which Petitioner was identified was unduly suggestive because Petitioner was the only participant with cornrows; 4) the lineup from which Petitioner was identified was unduly suggestive because Petitioner was significantly shorter than the other participants; 5) in violation of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), the prosecution knowingly deprived Petitioner of exculpatory evidence; and 6) the prosecution knowingly presented false testimony to the grand jury. (See Habeas Corpus Petition, dated Aug. 30, 2004 ("Pet."), Ex. H to Declaration in Opposition to Amended Petition ("Resp't Decl."); Petitioner's Motion Seeking Leave to Amend Petition, Endorsed by Court, dated Jan. 12, 2006 ("Leave to Amend and Memorandum Endorsed Order"), Ex. P to Resp't Decl.)  Respondent contends that Petitioner's claim that the photographic array was unduly suggestive is both unexhausted and barred by an adequate and independent state ground, and, in any event, all of Petitioner's claims are meritless. (<u>See</u> Respondent's Memorandum in Opposition to Amended Habeas Petition, dated May 10, 2006 ("Resp't Mem.").)

For the reasons that follow, this Court concludes that Petitioner is not entitled to habeas corpus relief and recommends that his claims be dismissed with prejudice.

## BACKGROUND

I.   Wade and Huntley Hearing

2

On June 9, 1999, a hearing was held in New York Supreme Court pursuant to United States v. Wade, 388 U.S. 218, 87 S. Ct. 1926 (1967), in response to Petitioner's motion to suppress the identification testimony of Carol Martell ("Martell") and Louis Champagne ("Champagne"). Petitioner challenged the suggestiveness of the lineup identification procedure and photographic array in which Martell and Champagne each identified Petitioner. In the same proceeding, the court also held a hearing pursuant to People v. Huntley, 15 N.Y.2d 72, 255 N.Y.S.2d 838 (1965), to address Petitioner's motion to exclude incriminating statements he made to a police officer after he had allegedly invoked his constitutional right to remain silent. The following facts pertaining to Petitioner's statements during interrogation, and the identifications of Martell and Champagne, were adduced.

The prosecution called one witness at the hearing, Detective John White of the Manhattan Robbery Squad. In September, 1998, Detective White was assigned to investigate the theft of expensive eyeglasses from two stores — Cohen's Fashion Optical and Lenscrafters — as part of a larger investigation into a pattern of armed robberies. (See Wade and Huntley Hearing Transcript, dated June 9, 1999 ("H. __."), at 4-5, 81.) During that investigation, Detective White prepared a computer-generated array that included a photograph of Petitioner, who is African-American, as well as the photographs of five other African-American males. (See H. 4-6.)

3

Each of the individuals in the array had some form of braids, or dreadlocks, though Petitioner was apparently the only one with a particular type of braids known as cornrows. (See H. 8-12; Signed Printouts of Photographic Array, dated Sept. 29, 1998 ("Photo Array"), Ex. Q to Resp't Decl.)

On September 29, 1998, Detective White showed the photo array to Martell and Champagne.  Martell, an employee of Lenscrafters who was present during the robbery of the store, identified Petitioner as one of the perpetrators. (See H. 10.)  Separately, Champagne, an employee of Cohen's Fashion Optical who witnessed the robbery at the store, selected Petitioner's picture from the photo array. (See H. 7.)  Both Martell and Champagne signed printouts of the photo array confirming their identification of Petitioner. (See Photo Array, Ex. Q to Resp't Decl.)

On January 7, 1999, Martell and Champagne each viewed a police lineup containing Petitioner and five "fillers," all of whom were seated. (See H. 21-27.)  Petitioner was 5'4" tall and weighed 130 pounds, while the five fillers were African-American males ranging in height from 5'6" to 5'11" and weighing between 130 and 200 pounds. (See Police Lineup Summary, dated Jan. 7, 1999 ("Lineup"), Ex. R to Resp't Decl.)  All of the lineup participants wore baseball caps, worn backwards, and Petitioner sat on a telephone book to adjust his height. (See H. 22.)  Martell and Champagne each independently identified Petitioner and signed a lineup sheet so

4

indicating. (See H. 21-25, 28-30.)

Earlier on January 7, 1999, prior to the lineup, Detective White picked up Petitioner at Riker's Island and took him to the Manhattan Robbery Squad station house. (See H. 12.)   White read Petitioner his Miranda rights, and, on a written form, Petitioner acknowledged that he had been given the Miranda warnings and was willing to answer questions. (See H. 13-16, 39.)   White then asked Petitioner about his involvement in eyeglass store robberies, and Petitioner replied that he did not rob eyeglass stores.  Detective White also testified that Petitioner stated that he only robbed clothing stores by himself, reiterating that he did not rob eyeglass stores with others.  Petitioner then acknowledged that he knew individuals named Campbell and Cross, who had been charged in the eyeglass store robberies, and that he had been "arrested with Mr. Campbell in 1995 for stealing watches." (See H. 17-18.) Detective White stated that the entire discussion lasted for approximately thirty minutes, and that it was all part of "one conversation." (See H. 40-41, 73.)

On the Miranda waiver form, in addition to Petitioner's initial acknowledgment and waiver, Detective White wrote, "No statement, he says he was not present for any robbery [with] Antonio Cam[p]bell." (H. 39, 42.)

At the hearing, defense counsel argued that the photographic array and lineup identifications by Martell and Champagne should

5

have been suppressed because they were unduly suggestive. Regarding the photo array, defense counsel argued that it represented the "essence of suggestibility" because everyone in the array had braids, despite the fact that none of the witnesses described the perpetrator as wearing braids.[1]  Regarding the lineup, defense counsel argued that Petitioner was shorter than the other participants and that the use of a baseball cap failed to effectively hide Petitioner's braided hairstyle. (See H. 76-78.) As to the Miranda claim, Petitioner's trial counsel argued that Petitioner had asserted that he wished to make "no statement," and thus the questioning should have immediately stopped. (See H. 79.)

The hearing court issued a decision denying Petitioner's motion to suppress both his incriminating statements and the witness identifications.  The court found that the photo array depicted six black males of similar age, complexion, hairstyle, and overall general appearance. (See H. 81-82.)  Regarding the lineup, the court found that there was nothing that drew one's attention to any person in the lineup, and that any differences in physical attributes were minimized by the way the lineup was conducted. (See H. 84, 85-86.)  Finally, the court found that Petitioner had knowingly, voluntarily, and intelligently waived his Miranda rights at the time he spoke to the police. (See H. 85.)

---

[1] As discussed in further detail below, this is a different — almost opposite — argument to the one Petitioner made on appeal to the Appellate Division.

6

II.  Evidence Adduced at Trial

     A.   Cohen's Fashion Optical

     On September 8, 1998, Louis Champagne was working as a salesperson at Cohen's Fashion Optical store, located at 750 Lexington Avenue in Manhattan. (See Trial Transcript, dated Sept. 22, 1999 ("Tr. __."), at 99-100, 102.)  He testified that, at approximately 1:30 p.m., two African-American males entered the store.  One was shorter and heavier than the other, wearing a "gray sweats outfit," and standing approximately 5'7" or 5'8" tall. (See Tr. 129-30.)  The shorter man was later identified as Antonio Campbell, and the taller man as Cecilio Cross.[2]  Campbell asked if the store carried Cartier sunglasses, which cost approximately $1,000 a pair, and an employee responded that they did.  When the manager opened the case to show him the sunglasses, Campbell went behind the counter and started grabbing sunglasses, while Cross came over and joined him. (See Tr. 104-05, 109-10.)

     The manager grabbed Campbell's hand and asked what he was doing; at that point, Champagne also walked over to the case. (See Tr. 105.)  As Champagne approached, the shorter man motioned toward his waist, put his hand inside his jacket, and said, he was going

―――――――――――

     [2] Cross and Campbell entered pleas of guilty on January 26, 1999 and February 19, 1999, respectively. (See Brief of Office of Appellate Defender for Defendant on Appeal to the Appellate Division ("Pet'r App. Br."), Ex. A to Resp't Decl., at 15 n.3.) According to Detective White, Campbell was 5'2" or 5'3" tall, and Cross was between 5'9" and 6'0" tall. (See Tr. 250.)  Petitioner is approximately 5'4". (See Lineup, Ex. R to Resp't Decl.)

7

to "shoot every single one of us in the store." (See Tr. 105, 109.)

According to Champagne, two minutes later, a third individual walked into the store and stood by the entrance, "securing the door" for the other two men. (See Tr. 110.)  Champagne described this third individual as "slim," and "a little taller" than the first two individuals, with his hair in cornrows (See Tr. 110, 131.)  In his testimony at trial, Champagne identified Petitioner as the third individual, the lookout. (See Tr. 112-13.)

As Campbell and Cross continued to take glasses out of the case, Campbell again stated that he was "going to shoot every single one of you." (See Tr. 110-11.)  According to Champagne, the store was well lit and, during the course of the robbery, Petitioner's "front side" was facing him. (See Tr. 114.)  Champagne testified that after another two minutes, Petitioner motioned to Campbell and Cross and said, "[l]et's get out of here." (See Tr. 111, 113.)

Petitioner left the store first, followed by the other two men. (See Tr. 111.)  Champagne testified that the three individuals walked toward 59th Street and then drove off in a white Ford Contour. (See Tr. 111-12.)  While his manager called the police, Champagne wrote down the license plate number of the Ford Contour, which he later gave to the police. (See Tr. 127-28.)

At trial, Detective White testified that the license plate number provided by Champagne did not correspond to a white Ford

8

Contour.  Instead, the license plate matched a gray Mercury Sable owned by Hertz Rental Car Company. (See Tr. 247, 250-51.)  Neither the car nor its license plate had been reported stolen, though the car was returned twenty days late, on September 28, 1998. (See Tr. 251-55.)

B. Lenscrafters

On September 13, 1998, Raquel Meza ("Meza") was working as the manager of a Lenscrafters store at 542 Fifth Avenue, in Manhattan. Carol Martell was working as an apprentice optician. (See Tr. 21-22, 25, 82-84.)  According to Martell and Meza, at around 4:00 p.m., two men entered the store and asked an employee named "Millie" if they could see designer sunglasses. (See Tr. 27-29, 59-60, 67, 74, 84.)  Martell and Meza described the men as both African-American, around 5'6" tall, and weighing approximately 190 pounds.  (See Tr. 26, 62-64, 84.)  One of the men, identified at trial as Petitioner, wore a baseball cap and was slightly taller than the other man, who was later identified as Antonio Campbell. (See id.)  Martell stated that, as Petitioner entered, he "caught [her] attention" because of his braids, which were visible underneath his baseball cap. (See Tr. 26.)

After Petitioner and Campbell requested to see the Cartier sunglasses, Millie went to talk to Meza, who had the key to the case. (See Tr. 84-85.)  Meanwhile, Petitioner and Campbell moved to the front of the store next to the case of Moschino sunglasses.

(See Tr. 29-30, 69, 74, 85-86, 95-96.)  Martell and Meza then heard a loud sound and Meza looked over to find that the case had been "pushed open." (See Tr. 30, 86-87.)  After a verbal exchange between Meza and Campbell, Meza momentarily walked away, then returned to find Campbell taking frames out of the case. (See Tr. 87-88, 96.)  Martell also saw Campbell reach into the case to grab frames "one after another," while Petitioner stood by, acting as a lookout. (See Tr. 30-31, 36, 74-76, 88.)

Martell testified that she walked over to the door and Petitioner and Campbell turned around to face her.  Campbell allegedly put his hand in his waistband and said, "bitch, get out of my way.  I've got a gun.  I'm going to shoot everybody." (See Tr. 32-33, 60-61, 76-77, 88-89.)  After Martell and Meza stood aside, Campbell exited the store and Petitioner followed him. According to Martell, as Petitioner attempted to exit, she grabbed his arm, at which point she was face-to-face with him.  Petitioner then escaped Martell's grip and left the store. (See Tr. 33-34, 37, 77-78, 89-90.)  Martell saw Petitioner and Campbell cross Fifth Avenue and head toward Madison Avenue, while Meza went to call the police. (See Tr. 34-35.)

The jury returned a verdict finding Petitioner guilty of all counts: two counts of Robbery in the First Degree and two counts of Robbery in the Second Degree. (See Tr. at 440-445.)

III. Procedural Background

10

In December, 2002, Petitioner, represented by counsel, filed an appeal with the Appellate Division, First Department, claiming that: 1) the trial court erred in denying his motion to suppress his statements to the police, in which he invoked his right to remain silent by indicating that he had no statement about the eyeglass store robberies; 2) the court erred in failing to suppress the identifications resulting from an unduly suggestive photographic array, in which Petitioner was the only person in the array wearing cornrows; 3) the court erred in failing to suppress the identifications resulting from an unduly suggestive police lineup, in which Petitioner was the shortest participant and sat on telephone books during the viewing process; and 4) the trial court erred in allowing the prosecutor to argue on summation, without adducing supporting evidence at trial, that the license plate number of the getaway car had not matched the car's description because the plates may have been stolen and replaced. (See Pet'r App. Br., Ex. A to Resp't Decl., at 3-4.)  In a pro se supplemental brief, Petitioner argued that the court erred in denying his motion to dismiss his indictment "when that indictment was supported solely by testimony that the [prosecutor] knew to be false." (Petitioner's Supplemental Brief, dated Mar. 13, 2003, Ex. C to Resp't Decl., at 5.)

On June 26, 2003, the Appellate Division unanimously affirmed Petitioner's conviction. See People v. Johnson, 306 A.D.2d 214, 761

N.Y.S.2d 229 (1st Dep't 2003).  The Appellate Division held that the hearing court properly denied Petitioner's motion to suppress his statement to the police, finding that "[t]here is no evidence that [Petitioner] invoked his right to remain silent; on the contrary, [Petitioner] expressly agreed to answer questions." 306 A.D.2d at 215, 761 N.Y.S.2d at 230.  With respect to Petitioner's motion to suppress the photographic array identification, the Appellate Division found that Petitioner "failed to preserve" the argument and, furthermore, "that the photo array was fair because all the persons depicted had braided hairstyles of various kinds, and because there was no evidence at the hearing that any witness had described [Petitioner] as having cornrows." (Id.)  Regarding the lineup, the Appellate Division found that "the participants were generally similar in appearance," and that "several fillers were similar in height to [Petitioner], and any height difference was minimized by the fact that they were all seated." (Id.)  Finally, regarding the prosecutor's comments on summation, the Appellate Division held that "[t]he challenged portion of the prosecutor's summation drew a reasonable inference from the evidence, in fair response to a defense argument, and was not unduly speculative." (Id.)  The court also "considered and rejected" the additional claim in Petitioner's pro se supplemental brief regarding improprieties in the grand jury proceedings. (See id. at 216.)

On August 8, 2003, Petitioner's appellate counsel submitted an application to the New York Court of Appeals seeking leave to appeal the Appellate Division's decision, asking the court to review whether 1) Petitioner's Miranda rights were violated, 2) the lineup was unduly suggestive, and 3) the prosecutor's remarks on summation were improper. (See Petitioner's Leave Application, dated Aug. 8, 2003 ("Pet'r Leave App."), Ex. E to Resp't Decl.)  Leave to appeal was denied on September 30, 2003. See People v. Johnson, 100 N.Y.2d 621, 767 N.Y.S.2d 404 (2003).

On August 30, 2004, Petitioner, proceeding _pro se_, filed the instant Petition for a writ of habeas corpus, claiming 1) the interrogating officer continued questioning him after he had invoked his right to remain silent, 2) the trial court committed reversible error by allowing the prosecutor to suggest during his summation that Petitioner stole and switched the license plates on the getaway car, 3) the lineup was unduly suggestive because Petitioner was significantly shorter than the other lineup participants and was the only participant who sat on telephone books, and 4) the photographic array was unduly suggestive because Petitioner was the only person in the array with cornrows. (See Pet.)  On March 30, 2005, this Court granted Petitioner's request to stay this proceeding so he could exhaust additional claims he wished to raise in the state courts. (See Memorandum Endorsed Order, dated Mar. 30, 2005, Ex. I to Resp't Decl.)

13

Petitioner then filed a motion, pursuant to New York Criminal Procedure Law § 440.10, to vacate his conviction, arguing that 1) in violation of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), the prosecutor withheld evidence indicating that Petitioner could not have committed the September 8 robbery of Cohen's Fashion Optical store because he had committed a different crime in Brooklyn on the same date, approximately thirty minutes earlier; and 2) the prosecutor knowingly presented false testimony before the grand jury. (See Petitioner's § 440.10 Motion, dated Mar. 24, 2005, Ex. J to Resp't Decl.)   Petitioner also argued that the prosecutor prevented him from presenting exculpatory evidence at trial by withholding evidence of contrary identifications by eyewitnesses, and by informing defense counsel that he would call two detectives as rebuttal witnesses if Petitioner called his girlfriend as an alibi witness at trial. (<u>See</u> <u>id.</u> at 11.)   Petitioner's motion to vacate was denied "for reasons set forth in the People's response." (See Order, dated May 27, 2005, Ex. M to Resp't Decl.)   Petitioner then sought and was denied leave to appeal. (See Certificate Denying Leave, dated Sept. 29, 2005, Ex. O to Resp't Decl.)

This Court then lifted its stay in an Order dated December 30, 2005.  On January 12, 2006, the Court granted Petitioner's motion for leave to amend his Petition to include the claims raised in his §440.10 motion. (See Leave to Amend and Memorandum Endorsed Order, Ex. P to Resp't Decl.)   Petitioner subsequently filed his C.P.L.

§440.10 motion papers with this Court.

**DISCUSSION**

I.   Standard of Review

Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), a federal court may grant habeas relief to a state prisoner only if a state court conviction "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or if it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

A state court decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 413, 120 S. Ct. 1495, 1523 (2000); accord Leslie v. Artuz, 230 F.3d 25, 32 (2d Cir. 2000); Clark v. Stinson, 214 F.3d 315, 320 (2d Cir. 2000).  The phrase, "clearly established Federal law, as determined by the Supreme Court of the United States," limits the law governing a habeas petitioner's claims to the holdings — not dicta — of the Supreme Court as they existed at the time of the relevant state court decision.  See Williams, 529

15

U.S. at 412, 120 S. Ct. at 1523; accord Leslie, 230 F.3d at 32.

A state court decision is based on an "unreasonable application" of Supreme Court precedent if it correctly identified the governing legal rule, but applied it in an unreasonable manner to the facts of a particular case. Williams, 529 U.S. at 413, 120 S. Ct. at 1523. The inquiry for a federal habeas court is not whether the state court's application of the governing law was erroneous or incorrect, but rather whether it was "objectively unreasonable." See id. at 408-10, 120 S. Ct. at 1521-22; see also Aparicio v. Artuz, 269 F.3d 78, 94 (2d Cir. 2001) ("[A] federal habeas court is not empowered to grant the writ just because, in its independent judgment, it would have decided the federal law question differently. The state court's application must reflect some additional increment of incorrectness such that it may be said to be unreasonable."); Lurie v. Wittner, 228 F.3d 113, 128-29 (2d Cir. 2000) (same).

Under AEDPA, "a determination of a factual issue made by a State court shall be presumed to be correct. The [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); see also Parsad v. Greiner, 337 F.3d 175, 181 (2d Cir.) ("The presumption of correctness is particularly important when reviewing the trial court's assessment of witness credibility."), cert. denied, 540 U.S. 1091, 124 S. Ct. 962 (2003). A state court's findings of fact

16

"will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041 (2003).

## II.  Miranda Claim

On January 7, 1999, the police took Petitioner into custody. While in custody, Detective John White of the Manhattan Robbery Squad advised Petitioner of his Fifth Amendment rights in accordance with Miranda v. Arizona, 384 U.S. 436 (1966), and Petitioner signed a form indicating that he both acknowledged receiving the Miranda warnings and was willing to answer questions in waiver of his Miranda rights. (See H. 13-16.)  After questioning commenced, Petitioner claims that, at some point, he told Detective White he had "no statement" in response to questions about the robberies of the eyeglass stores.  In response to subsequent questioning, Petitioner admitted that he knew Cross and Campbell, the two other men involved in the eyeglass store robberies.  On the Miranda waiver form, signed by Detective White and Petitioner, Detective White wrote "no statement, he says he was not present for any robbery [with] Antonio Cam[p]bell." (H. 39, 42.)  In explaining that notation, Detective White testified that he wrote this down because "[Petitioner] didn't implicate himself in any other eyeglass robberies.  So he wanted to put down that and I wrote down what he asked me to put down." (H. 42.)  When asked whether

Petitioner had actually said "no statement," Detective White responded, "I don't remember him saying that, no." (H. 75.) Petitioner argues that his admission to police that he knew Campbell and Cross came after he had invoked his right to remain silent by responding "no statement" to Detective White's questions regarding the eyeglass store robberies, and thus should have been suppressed.

In denying Petitioner's motion, the hearing court found Detective White to be a credible witness (see H. 81), and held that Petitioner "was properly advised of his Miranda warnings and thereafter, knowingly, intelligently, waived them and made one exculpatory statement and two other statements relating to other activities but not the two robberies in question" (H. 85).  On appeal, the Appellate Division held that the hearing court properly denied Petitioner's motion to suppress his statement that he knew the other two robbery suspects, finding that "[t]here is no evidence that [Petitioner] invoked his right to remain silent; on the contrary, [Petitioner] expressly agreed to answer questions." People v. Johnson, 306 A.D.2d at 215, 761 N.Y.S.2d at 230.  After "[v]iewing the detective's testimony as a whole," the court concluded that "his notation of 'No Statement' on a police form meant only that defendant denied any involvement in the robberies." (Id.)

For purposes of habeas review, the Court must presume state

18

court factual findings to be correct, and Petitioner has the burden of overcoming this presumption by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Here, Petitioner fails to meet his burden of establishing that the state court's ruling was based on an unreasonable determination of the facts; consequently, accepting the state court's factual findings, this Court finds that Petitioner has failed to establish that the Appellate Division's decision was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court.

Invocation of the right to remain silent must be construed liberally. See Hoffman v. United States, 341 U.S. 479, 486, 71 S. Ct. 814 (1951). An accused need not rely on talismanic phrases or "any special combination of words" to invoke the right. See Quinn v. United States, 349 U.S. 155, 162, 75 S. Ct. 668 (1955). However, in order to assert his right to silence during the course of an interrogation, a suspect must unequivocally and unambiguously state his desire not to be subject to further questioning. See Ramirez v. Miller, No. 04 Civ. 2967 (WHP) (JCF), 2005 WL 659144, at *4 (S.D.N.Y. Mar. 11, 2005); cf. United States v. Ramirez, 79 F.3d 298, 304 (2d Cir. 1996) ("If, before or during the interrogation, the suspect states unequivocally that he wishes to remain silent and refuses to answer questions, interrogation ordinarily must cease."); Bruno v. Cunningham, No. 03 Civ. 937 (MBM), 2004 WL

19

2290503, at *6-7 (S.D.N.Y. Oct. 5, 2004) ("Police officers . . . are not required to be psychic so as to detect an unexpressed desire to invoke rights.").

In some circumstances, it may be unclear whether a suspect has invoked his right to remain silent.  Where a suspect has invoked his right equivocally or ambiguously, the police are permitted to ask narrow questions only for the purpose of clarifying the ambiguity. See United Stats v. Ramirez, 79 F.3d at 304 (citing Campaneria v. Reid, 891 F.2d 1014, 1021 (2d Cir. 1989)); Bruno, 2004 WL 2290503, at *6.  "In some circumstances, however, a suspect's statement as to his willingness or unwillingness to answer questions, or his silence in response to some questions, does not constitute even an ambiguous or equivocal invocation of the right to remain silent." United States v. Ramirez, 79 F.3d at 304.

Here, Petitioner expressly waived his Miranda rights and expressed his willingness to answer questions.  Petitioner then denied robbing the eyeglass stores. (See H. 17.)  According to Detective White, Petitioner stated that he "doesn't commit robberies with others and he normally only robs clothing stores not eyeglass stores." (H. 17-18.)  Petitioner also told Detective White that "he knew Cross and he knew Campbell," and that he had been arrested with Campbell in 1995 for stealing watches. (See H. 17.)  At some point in the course of the interrogation, which Detective

White characterized as "one conversation" that lasted approximately thirty minutes (see H. 40-41, 73), the detective wrote on the Miranda waiver form "No statement, he says he was not present for any robbery [with] Antonio Cam[p]bell" (H. 39).

A court should examine "the entire context in which the claimant spoke" to determine if the right to remain silent has been invoked. See Bradley v. Meachum, 918 F.2d 338, 342 (2d Cir. 1990) (citing United States v. Goodwin, 470 F.2d 893, 902 (5th Cir. 1972), cert. denied, 411 U.S. 969, 93 S. Ct. 2160 (1973)); see also Curry v. Burge, No. 03 Civ. 0901 (LAK)(AJP), 2004 WL 2601681, at *17 (S.D.N.Y. Nov. 17, 2004); U.S. v. De Santis, No. 00 Cr. 829 (AGS), 2000 WL 1863538, at *3 (S.D.N.Y. Dec 20, 2000).  While Petitioner attempts to focus exclusively on Detective White's notation of "no statement" on the Miranda waiver form, the phrase was only one part of a larger sentence, the rest of which sounds like a denial of guilt, not an invocation of the right to remain silent.  Taken in the context of the entire interrogation, in which a majority of Petitioner's statements were denials of the allegations, albeit often by admitting to other crimes, the state court's interpretation of Detective White's notation is eminently reasonable and is entitled to a presumption of correctness.

Moreover, statements similar to the one in Petitioner's Miranda waiver form have previously been found insufficient to constitute an invocation of the right to remain silent.  In

21

Bradley, the suspect received Miranda warnings and indicated his willingness to talk to the police. See Bradley, 918 F.2d at 342. When asked about the robbery at issue, the suspect first stated that he was not going to say whether he was involved or not, then immediately denied any connection to the robbery. See id.  The suspect subsequently engaged in a one-hour colloquy with the police, telling the interrogating officer that he had no alibi, but then proceeding to account for his whereabouts at the time of the crime. See id. at 340-41.  The Second Circuit held that the suspect's initial statement that he would not say whether or not he had been involved was "part of an ongoing stream of speech which included a subsequent denial of his involvement in the robbery," and was neither "an invocation of the right to remain silent," nor "the functional equivalent of silence." Id. at 342-43.  Here, although the statement in question was a written notation by the detective, Petitioner does not expressly contend that it was inaccurate.  Instead, he attempts to attribute a certain meaning to a small portion of it.  Much like the statement in Bradley, it begins with "no statement" - an initial clause suggesting that he "would not say whether or not he had been involved" - and then includes a "subsequent denial of his involvement."  In addition, similar to the one-hour colloquy in Bradley, Petitioner's statements were made in the context of a thirty minute interrogation in which he responded to other questions, but denied

22

involvement in the crimes at issue. (See H. 17-18, 40-42.)

Even were this Court to overturn the factual finding of the state court, and conclude that the detective's notation did not indicate a denial of guilt but, rather, the attempted invocation of Petitioner's right to remain silent, there remains the question of whether the invocation was sufficiently unequivocal and unambiguous to require the detective to cease his questioning. In Ramirez, the Second Circuit considered whether a defendant's silence in the wake of a few questions, while answering others, constituted even an equivocal invocation of his right to remain silent. See United States v. Ramirez, 79 F.3d at 303-305. The Ramirez court relied on the Supreme Court's standard regarding invocation of the right to counsel, which held that "when a suspect has knowingly and voluntarily waived his Miranda rights and then makes a reference to counsel that is insufficiently clear to invoke the Edwards prohibition on further questioning . . . , law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney." Id. at 305 (quoting Davis v. United States, 512 U.S. 452, 114 S. Ct. 2350 (1994)) (internal quotation marks omitted). Applying the Davis standard in the context of the right to remain silent, the Second Circuit held that the "nonresponse to two questions, having answered others, did not require the cessation of questioning since [the suspect's] silence certainly did not constitute a clear request that all further questioning

23

cease." <u>Id.</u> at 305.  Here, Petitioner's alleged invocation of the right to remain silent was even less clear.  There is no evidence that Petitioner was ever silent or refused to answer a single question, and the only alleged evidence of invocation of his <u>Miranda</u> rights was a notation by the detective that is more ambiguous than the suspect's silence in Ramirez.

As Petitioner had not unequivocally invoked his right to remain silent, the state appellate court's determination that Petitioner had waived his Miranda rights was not contrary to, nor an unreasonable application of, clearly established Supreme Court law.  For that reason, Petitioner's Miranda claim should be dismissed.

III. <u>Wade Claims</u>

Petitioner argues that his due process rights were violated because witness identifications made based on the photographic array, and later on the police lineup, were both unduly suggestive. In regard to the photographic array, Respondent argues that Petitioner's claim is unexhausted and barred by an adequate and independent state ground; and, in any event, that Petitioner's claim is without merit. (<u>See</u> Resp't Mem., at 39.)  In regard to the police lineup identification, Respondent argues that the Appellate Division's denial of Petitioner's claim was not contrary to, nor an unreasonable application of, clearly established Supreme Court law. (<u>Id.</u> at 34).

24

A.   <u>Photographic Array</u>

It is well-settled that all state remedies must be exhausted before a federal court may consider a state prisoner's petition for a writ of habeas corpus.  <u>See</u> 28 U.S.C. § 2254(b)(1)(A); <u>Baldwin v. Reese</u>, 541 U.S. 27, 29, 124 S. Ct. 1347, 1349 (2004); <u>Cotto v. Herbert</u>, 331 F.3d 217, 237 (2d Cir. 2003).  "At the core of the exhaustion doctrine . . . is the 'respect for our dual judicial system and concern for harmonious relations between the two adjudicatory institutions.'" <u>Jones v. Vacco</u>, 126 F.3d 408, 413 (2d Cir. 1997) (quoting <u>Daye v. Att'y Gen. of N.Y.</u>, 696 F.2d 186, 191 (2d Cir. 1982) (en banc)).  Although both federal and state courts are charged with protecting a state criminal defendant's federal constitutional rights, the state courts must first be given an opportunity to consider and correct any violations of federal law. <u>See</u> <u>id</u>.

_____ Where state law affords a petitioner the right to raise a constitutional claim "by any available procedure," and the claim is not raised, it cannot be deemed exhausted.  28 U.S.C. § 2254(c).  To satisfy the exhaustion requirement of 28 U.S.C. § 2254, "it is not sufficient merely that the [petitioner] has been through the state courts." <u>Picard v. Connor</u>, 404 U.S. 270, 275-76, 92 S. Ct. 509, 512 (1971).  Rather, the claims must be fairly presented to the state courts so that the state has an opportunity to correct any alleged constitutional violations.  To "fairly present" a

claim, the petitioner must raise "all of the essential factual allegations" and "essentially the same legal doctrine" asserted in the federal habeas petition.  Strogov v. Att'y Gen. of N.Y., 191 F.3d 188, 191 (2d Cir. 1999) (quoting Daye, 696 F.2d at 191-92).  "This means, in essence, that in state court the nature or presentation of the claim must have been likely to alert the court to the claim's federal nature."[3] Cox v. Miller, 296 F.3d 89, 99 (2d

---

[3] In addition, as the Second Circuit noted in Daye, it is often difficult to determine "whether the legal doctrines asserted in state and federal courts are substantially the same" when the Petitioner does not cite to the specific constitutional provision relied on. Daye, 696 F.2d at 192.  Nevertheless, a petitioner may satisfy the exhaustion requirement in this regard without "citing 'book and verse on the federal constitution.'" Id. (quoting Picard, 404 U.S. at 278).  The Daye court discussed various ways to meet the essential requirement of the exhaustion doctrine, concluding:

> In summary, the ways in which a state defendant may fairly present to the state courts the constitutional nature of his claim, even without citing chapter and verse of the Constitution, include (a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation.  In all such circumstances the federal habeas court should assume that the state courts . . . have been alerted to consider, and have considered, the constitutional claim.

Id. at 194. Here, the constitutional nature of Petitioner's claim regarding the photographic array is not in dispute.  Rather, as discussed below, Petitioner's error is that he made a *different*

Cir. 2002) (quoting <u>Daye</u>, 696 F.2d at 192); <u>see also</u> <u>Duncan v.</u>
<u>Henry</u>, 513 U.S. 364, 365-66, 115 S. Ct. 887, 888 (1995) (per
curiam) ("If state courts are to be given the opportunity to
correct alleged violations of prisoners' federal rights, they must
surely be alerted to the fact that the [petitioner is] asserting
claims under the United States Constitution.").

At his suppression hearing, Petitioner's counsel argued that
the photographic array constituted the "essence of suggestibility"
because all of the individuals portrayed had braided hair even
though "none of [the witnesses] describe[d] the perpetrators as
having braids." (H. 76.)   Before the Appellate Division,
Petitioner's counsel reversed course, arguing that the photographic
array was unduly suggestive because Petitioner "was the only person
in the array with a distinctive type of hairstyle known as
cornrows." (Pet'r App. Br., Ex. A to Resp't Decl., at 25.)
Respondent argued to the Appellate Division that, "having conceded
below that the participants shared the same hairstyle, [Petitioner]
should not now be heard to argue the opposite on appeal."
(Respondent's Brief to Appellate Division, Ex. B to Resp't Decl.,
at 23.)   Accepting Respondent's argument, the Appellate Division
found that Petitioner "failed to preserve his argument" by
neglecting to raise this objection at the suppression hearing.

---

claim before the Appellate Division, and to this Court, than the
one he made originally at his <u>Wade</u> hearing (albeit under the same
constitutional provision).

People v. Johnson, 306 A.D.2d. at 215, 761 N.Y.S.2d at 230.[4]  The Appellate Division's reliance on the contemporaneous objection rule constitutes an adequate and independent ground, which precludes federal habeas review. See Wainwright v. Sykes, 433 U.S. 72, 86-87, 97 S. Ct. 2497 (1977) (failure to comply with contemporaneous objection rule constitutes adequate and independent state ground); Velasquez v. Leonardo, 898 F.2d 7, 9 (2d Cir. 1990) (violation of New York's contemporaneous objection rule is an adequate and independent state ground).

In addition, Petitioner forfeited the possibility of federal review of his claim that there was an unduly suggestive photographic array because, in his application for leave to appeal to the New York Court of Appeals, Petitioner did not raise a claim regarding the photographic array.[5] (See Pet'r Leave App., Ex. E to

---

[4] The fact that the Appellate Division went on to address the merits in the alternative is irrelevant, as it expressly relied on a procedural default as an independent and adequate state ground. See Velasquez, 898 F.2d at 9 ("[F]ederal habeas review is foreclosed when a state court has expressly relied on a procedural default as an independent and adequate state ground, even where the state court has also ruled in the alternative on the merits of the federal claim."); see also Garcia v. Lewis, 188 F.3d 71, 77-82 (2d Cir.1999); Glenn v. Bartlett, 98 F.3d 721, 724-25 (2d Cir. 1996); accord Harris v. Reed, 489 U.S. 255, 264 n.10, 109 S. Ct. 1038, 1044 n.10 (1989) ("a state court need not fear reaching the merits of a federal claim in an alternative holding").

[5] When a petitioner includes his Appellate Division brief in a leave application to the Court of Appeals, he may fairly present all federal claims raised in that brief even if he does not specifically request the Court to consider each of those claims. See generally Galdamez v. Keane, 394 F.3d 68 (2d Cir.

Resp't Decl.)  Petitioner's photo identification suppression claim is therefore unexhausted. See Strogov, 191 F.3d at 191; Daye, 696 F.2d at 194.  Moreover, the claim is procedurally defaulted because the issue cannot now be heard by the state courts.  Petitioner cannot seek a direct appeal of this issue, having already made the one request for appeal to which he is entitled, see N.Y. Court R. § 500.10(a); nor can he seek collateral review via a motion pursuant to § 440.10 of the New York Criminal Procedure Law, because the factual basis for the claim was on the record and clearly available to him at the time he lodged his direct appeal. See N.Y. Crim. Proc. Law § 440.10(2)(c); accord Aparicio, 269 F.3d at 90-91. The claim is therefore deemed exhausted, but procedurally barred from review. See Aparicio, 269 F.3d at 91; Ramirez v. Att'y Gen., 280 F.3d 87, 94 (2d Cir. 2001); Reyes v. Keane, 118 F.3d 136, 139 (2d Cir. 1997); Bossett v. Walker, 41 F.3d 825, 828 (2d Cir. 1994); Grey v. Hoke, 933 F.2d 117, 120-21 (2d Cir. 1991).

     This Court may consider the claim only if Petitioner "can demonstrate cause for the default and actual prejudice as a result

---

2005).  However, a petitioner who explicitly requests the Court of Appeals to consider *some* issues raised in an Appellate Division brief fails to fairly present any other issues. See Jordan v. Lefevre, 206 F.3d 196, 198-99 (2d Cir. 2000).  Here, Petitioner included his Appellate Division brief, which raised the issue of the photographic array, as part of his application for leave to appeal to the Court of Appeals; but, the application itself explicitly requested that the Court of Appeals consider three specific issues, none of which addressed the photographic array.  Hence, the issue was not fairly presented on appeal.

of the alleged violation of federal law, or demonstrate that failure to consider the claim[ ] will result in a fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. 722, 750, 111 S. Ct. 2546, 2565 (1991); accord Dretke v. Haley, 541 U.S. 386, 393, 124 S. Ct. 1847, 1852 (2004); Edwards v. Carpenter, 529 U.S. 446, 451, 120 S. Ct. 1587, 1591 (2000); Dixon v. Miller, 293 F.3d 74, 80-81 (2d Cir. 2002); Ramirez v. Att'y Gen., 280 F.3d at 94; Reyes, 118 F.3d at 138.  "[T]he cause standard requires the petitioner to show that 'some objective factor external to the defense impeded counsel's efforts' to raise the claim in state court." McClesky v. Zant, 499 U.S. 467, 493, 111 S. Ct. 1454, 1470 (1991) (quoting Murray v. Carrier, 477 U.S. 478, 488, 106 S. Ct. 2639, 2645 (1986)); accord Bloomer v. United States, 162 F.3d 187, 191 (2d Cir. 1998).  For example, a petitioner must demonstrate "that the factual or legal basis for a claim was not reasonably available to counsel, . . . or that 'some interference by state officials' made compliance impracticable, . . . [or that] the procedural default is the result of ineffective assistance of counsel." Murray, 477 U.S. at 488, 106 S. Ct. at 2645 (citations omitted); see also Bossett, 41 F.3d at 829.  _____

_____In the instant case, Petitioner provides no such explanation for his procedural default, nor is any cause apparent from the record.  In the absence of cause, the Court need not address the issue of prejudice. See Bentley v. Scully, 851 F. Supp. 586, 604

(S.D.N.Y.), vacated on other grounds, 41 F.3d 818 (2d Cir. 1994)(where a "petitioner has failed to establish 'cause,' in other words why he did not raise these claims at the appropriate time and in the appropriate forum, it is unnecessary to make an inquiry into the question of 'prejudice.'"); accord Engle v. Isaac, 456 U.S. 107, 134 n.43, 102 S. Ct. 1558, 1575 (1982); Richter v. Artuz, 77 F. Supp. 2d 385, 395 (S.D.N.Y. 1998) (Report and Recommendation, adopted on Nov. 18, 1999); Meachem v. Keane, 899 F. Supp. 1130, 1139 (S.D.N.Y. 1995) (Report and Recommendation, adopted on Sept. 13, 1995).

The other means by which Petitioner may avoid a procedural default is to demonstrate that a fundamental miscarriage of justice has occurred, which has been construed to mean "a constitutional violation has probably resulted in the conviction of one who is actually innocent." Murray, 477 U.S. at 496, 106 S. Ct. at 2649; see also Dixon, 293 F.3d at 81. The Supreme Court has explained that this exception "remains rare" and should be applied only in "extraordinary case[s]." Schlup v. Delo, 513 U.S. 298, 321-22, 115 S. Ct. 851, 864 (1995). "Actual innocence means factual innocence, not mere legal insufficiency." Bousley v. United States, 523 U.S. 614, 623, 118 S. Ct. 1604, 1611 (1998). "To establish actual innocence, [a] petitioner must demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." Id. (internal citations omitted).

31

Although Petitioner argues that several of his constitutional rights were violated, he has not articulated an "actual innocence" claim and he has not offered any new evidence of his innocence. See Schlup, 513 U.S. at 316, 115 S. Ct. at 862 ("[W]ithout any new evidence of innocence, even the existence of a concededly meritorious constitutional violation is not itself sufficient to establish a miscarriage of justice that would allow a habeas court to review the merits of a barred claim."); see also Dunham v. Travis, 313 F.3d 724, 730 (2d Cir. 2002) ("[R]eference to the actual innocence exception is puzzling; [Petitioner] presented no new evidence of his innocence . . . .").

This Court therefore has no basis to excuse Petitioner's procedural default of his objection to the photographic array, and respectfully recommends that this claim be dismissed.

B.   Police Lineup

On January 7, 1999, one day after the police arrested Petitioner for robbery, Detective John White asked Lenscrafters employee Carol Martell and Cohen's Optical employee Louis Champagne, the only witnesses who identified Petitioner from the photo array, to view a lineup at the police station.  The lineup they viewed was made up of six African-American males, including Petitioner. (See H. 22.)

The five "fillers" in the lineup ranged from 5'6" to 5'11" in height, and were between 130 and 200 pounds. (See Lineup, Ex. R to

Resp't Decl.).  Petitioner was 5'4" tall and 130 pounds. (See id.)
At 31, Petitioner was the oldest person in the lineup; two of the
"fillers" were 29, one was 28, one was 27, and one was 22. (See
id.)  In order to conceal the fact that Petitioner was the only
person in the lineup who wore his hair in cornrows, Detective White
had all of the participants wear a baseball cap facing backwards.
(See H. 36-37.)  Because Petitioner was slightly shorter than the
rest of the lineup participants, the police had him sit on a
telephone book.

Martell and Champagne each viewed the lineup separately. (See
Tr. 231-32.)  When Martell viewed the lineup, she told Detective
White, "I think it's Number 5," which was Petitioner, and then
requested to see him standing. (See Tr. 82; H. 32; Lineup, Ex. R to
Resp't Decl.)  After each of the participants stood and approached
the viewing window separately, Martell confirmed her opinion that
it was Petitioner. (See Tr. 56, 82; Lineup, Ex. R to Resp't Decl.)
Champagne, upon viewing the lineup participants while seated,
identified Petitioner. (See H. 21-25.)

On these facts, Petitioner contends that the state court
erroneously allowed the admission of "an unduly suggestive lineup
identification procedure where a significant height disparity
existed between the [P]etitioner and the other lineup participants,
and where [P]etitioner was the only participant who sat on
telephone books." (Pet., at 6.)  The Appellate Division considered

33

and rejected this claim, holding that the lineup was not unduly suggestive. <u>See</u> <u>People v. Johnson</u>, 306 A.D.2d at 215, 761 N.Y.S.2d at 230.  In finding that the "participants were generally similar in appearance," based on an examination of photographs of the lineup, the Appellate Division reasoned that "several fillers were similar in height to [Petitioner], and any height difference was minimized by the fact that [the participants] were all seated." <u>Id.</u> In regard to Martell's request that the participants stand, the court noted that "each person in the lineup stood and approached the window separately, so as to minimize any height comparison," and "the witness had already picked out [Petitioner] when he was sitting with the fillers." (<u>Id.</u>)  The Appellate Division's decision was neither contrary to, nor an unreasonable application of, Supreme Court law.

The Supreme Court has established a two-step inquiry for evaluating whether the admission of an out-of-court identification comports with due process.  First, the court must determine whether the identification procedure used was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." <u>Simmons v. United States</u>, 390 U.S. 377, 384, 88 S. Ct. 967 (1968); <u>accord</u> <u>Jarrett v. Headley</u>, 802 F.2d 34, 40-41 (2d Cir. 1986); <u>Smith v. Ortiz</u>, No. 01 Civ. 5848 (DAB), 2006 WL 1458404, at *6 (S.D.N.Y. May 25, 2006).  Second, even assuming the procedure used was unnecessarily suggestive, the identification

still may be admitted at trial if the "totality of the circumstances" shows that the identification was independently reliable. See Raheem v. Kelly, 257 F.3d 122, 133 (2d Cir. 2001) ("[R]eliability is the linchpin in determining the admissibility of identification testimony." (quoting Manson v. Brathwaite, 432 U.S. 98, 114, 97 S. Ct. 2243 (1977))); Castillo v. Walsh, 443 F. Supp. 2d 557, 568 (S.D.N.Y. 2006).  Whether or not the identification was independently reliable turns on "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." Raheem, 257 F.3d at 135 (quoting Neil v. Biggers, 409 U.S. 188, 199-200, 93 S. Ct. 375 (1972)).

First, in denying Petitioner's suppression motion, the hearing court came to a similar conclusion as the Appellate Division,[6] finding that "[nothing draws ones attention to any particular person in this line-up" (H. 84), and therefore, "the line-ups were not unduly suggestive or improper" (H. 86).  The hearing court noted that the participants were all of "approximate[ly the] same age, skin tone . . . , [and] general complexion," they all

---

[6] A federal habeas court may rely upon the record of both the trial and suppression hearing in determining whether an identification procedure is suggestive. See Jackson v. Fogg, 465 F. Supp. 177, 184-85 (S.D.N.Y.), aff'd, 589 F.2d 108 (2d Cir. 1978).

"appear[ed] to have slight facial hair or mustache," and "[a]ny braids that [Petitioner] or other participants had at the time of the lineup [were] not visible to me by viewing these photographs [of the lineup]." (H. 84-86.)   Those factual findings are presumptively correct for the purpose of this proceeding, and Petitioner has not demonstrated otherwise by clear and convincing evidence. See 28 U.S.C. § 2254(e)(1); see also Carroll v. Greene, No. 04 Civ. 4342 (RWS), 2006 WL 2338119, at *11 (S.D.N.Y. Aug. 11, 2006) (accepting as a presumptively correct factual finding the trial court's ruling, upon reviewing a photograph of the lineup, that one of the fillers ""was not much lighter than [petitioner] in skin color" and, "[i]n any event, it doesn't appear to me that this line up is unduly suggestive.").

Even without the benefit of this presumption, Petitioner's primary claim that he was shorter than the other lineup participants must be rejected because there is no evidence that either witness — Martell or Champagne — identified Petitioner on the basis of his height.  "A lineup is unduly suggestive as to a given defendant if he meets the description of the perpetrator previously given by the witness and the other lineup participants obviously do not." Raheem v. Kelly, 257 F.3d 122, 134 (2d Cir. 2001). Thus, the "focus of the inquiry is not whether the suspect has a distinctive feature not shared by the other participants, but whether that feature matches the description provided by the

witness." <u>West v. Greiner</u>, No. 01 Civ. 1267 (JG), 2004 WL 315247, at *5 (E.D.N.Y. Feb. 12, 2004); <u>see also</u> <u>Gilbert v. Superintendent of the Collins Corr. Facility</u>, No. 03 Civ. 3866 (LBS), 2004 WL 287683, at *12 (S.D.N.Y. Feb. 11, 2004) (lineup was not unduly suggestive even though petitioner was the only individual wearing a brown leather jacket because witness had not focused on that aspect of his assailant's appearance).

Here, notwithstanding evidence that Petitioner was only two inches shorter than two of the other lineup participants, and that the participants were sitting at the time of Martell's initial identification, and remained sitting throughout Champagne's identification, the fact that Petitioner was shorter than the other participants would not have rendered the lineup unduly suggestive with respect to either witness because neither of them focused their attention on that aspect of Petitioner's appearance.

At trial, when asked to describe the perpetrators of the robberies, Champagne testified that Petitioner was taller than 5'7" or 5'8" (<u>see</u> Tr. 131, 245-46), while Martell estimated that Petitioner was either 5'6" or 5'7" tall (<u>see</u> Tr. 26, 62-64).[7]  In addition, Detective White testified at the <u>Wade</u>/<u>Huntley</u> hearing

---

[7] Indeed, Petitioner's counsel, in his summation, argued that the fact that Champagne and Martell described the perpetrator as being significantly taller proved that they had misidentified his client. (<u>See</u> Tr. 327, 341.)  As such, Petitioner appears to argue that the fact that he is shorter than the descriptions provided by the witnesses is both proof of his innocence and unduly suggestive of his guilt.

that, in the course of his interviews with Champagne and Martell after the robberies, Champagne described Petitioner as 5'7" tall, and Martell estimated that he was 5'6" tall. (See H. 52-53)  Even assuming that, at 5'3" tall, Petitioner was significantly shorter than the other lineup participants, that fact would not have rendered the lineup unduly suggestive because it would not have focused the witnesses' identifications on Petitioner.  In fact, had Martell and Champagne focused on Petitioner's height at the lineup, they would likely have identified someone *other than* Petitioner, since the heights of several of the other lineup participants were more consistent with their descriptions than Petitioner's height.

Petitioner further argues that the lineup was unduly suggestive because he was the only lineup participant with braids. Unlike Petitioner's height, Petitioner's hairstyle was a feature that both witnesses accurately described and relied upon. (See Tr. 26, 131.)  However, the Appellate Division found that there was no evidence that Petitioner's hairstyle could be seen under the baseball cap that he was required to wear (as is true of all of the other lineup participants), and the hearing court found that "[any braids that [Petitioner] or other participants had at the time of the lineup [were] not visible to me by viewing these photographs [of the lineup]." (H. 86.)  The Court cannot find clear and convincing evidence to the contrary.  In fact, the police officer who conducted the lineup, Detective White, whom the hearing court

found to be a credible witness (see H. 81), testified that Petitioner's cornrows were not visible under his hat (see H. 36-37).  Moreover, even accepting Petitioner's argument that his cornrows may have been visible to Martell when she requested that each participant stand, she had already preliminarily selected Petitioner from the lineup, albeit tentatively; and, Champagne identified Petitioner without having him stand up.

The Court cannot say that the Appellate Division's denial of Petitioner's challenge to the lineup identification was contrary to, or involved an unreasonable application of, the Supreme Court's clearly established law.  Specifically, upon lending the required deference under AEDPA to the state court's findings, the Court finds that the lineup procedure was not so impermissibly suggestive so as to raise a substantial likelihood of irreparable misidentification.  Having held that the lineup was not unduly suggestive, the identification presents no due process violation, and no further inquiry is required regarding reliability.[8]

---

[8] The Court notes, however, that were it to consider the reliability of the witnesses' identifications under the Biggers factors, those factors appear to be in equipoise.  The lineup occurred over a month after the robberies occurred, and the descriptions provided by the witnesses, especially in terms of height and weight, deviated significantly from Petitioner's actual build.  On the other hand, each of the witnesses had ample opportunity to clearly view Petitioner at close range. (See T. 64, 113-14 (Martell had five to ten minutes over the course of thirty minute robbery to view Petitioner; Champagne had two minutes in which Petitioner was facing him).)  In addition, both Martell and Champagne testified that, after selecting Petitioner out of the lineup, they were each "sure" he was one of the

IV.  <u>Prosecutor's Summation</u>

Petitioner argues that on summation, the prosecutor engaged in misconduct by suggesting that Petitioner "stole and switched license plates when the indictment did not charge [him] with stealing license plates and absolutely no evidence existed to support" the prosecutor's assertion. (See Pet., at 5.)

At trial, Louis Champagne testified that, after robbing Cohen's Fashion Optical, Petitioner and the other two robbers left in a white Ford Contour.  Champagne wrote down the license plate number of the car and gave it to the police. (See Tr. 127-28.) Detective White testified at trial that the license plate number recorded by Champagne was registered to a gray Mercury Sable owned by Hertz rental car, and that neither the car nor the plates were ever reported stolen. (See Tr. 246-47, 250-55.)

On summation, it was not the prosecutor, but defense counsel, who first raised the possibility that the license plates were stolen.[9] (See Tr. 343.)  Petitioner's counsel argued that, even

_____

perpetrators. (See Tr. 56, 82; 122, 138-39.)

[9] Defense counsel stated on summation that "[t]he prosecution has argued or attempted to argue that maybe the plates were removed, maybe the car was stolen.  Maybe it was taken to Turkey.  Who knows what happened to the car?" (H. 343.) Defense counsel appears to be referring to the prosecutor's cross-examination of Detective White during trial.  At that time, the prosecutor attempted to ask the detective whether a license plate can be removed from a car, at which point an objection by defense counsel was sustained. (See T. 252.)  It was defense counsel who then repeatedly asked the detective about whether the car or its license plate had ever been reported stolen. (See T.

though Champagne was "sure" he had recorded the right license plate number, the "license number and the car didn't match up." (Tr. 342-43.)    Petitioner's counsel then used the issue to question Champagne's reliability as a witness: "That automobile, he was sure, that's the one with the license number . . . . He conveyed it to the cops and, woops, that's a mistake.  This is not a reliable witness.  Well, maybe he was having a bad day.  Maybe he's not so good with cars.  Maybe he's not so good with heights including his own height.  The guy makes lineup identifications." (Tr. 343-44.)

In her summation, the prosecutor responded to Petitioner's counsel's arguments about Champagne's credibility.  The prosecutor stated, "don't be distracted by the car . . . . Defense counsel would have you believe that because he saw a . . . white Ford Contour, and wrote down a license plate number . . . [that] came back as [a] gray rental car, that [Champagne] must be an unreliable witness.  That's not true.  If you were going to rob a store . . . do you really think you would take a car with a license plate that matches that car . . . that could be traced back to you?  Of course not." (Tr. 375-76.)   Petitioner's counsel objected during that statement and the court overruled the objection.  The prosecutor then said, "[m]ost likely, [Petitioner] or one of his partners took that license plate off another car." (Tr. 376-77.)  The court then sustained counsel's objection and immediately instructed the jury:

252-54.)

41

> Basically, each side is making arguments from
> the record.  What I want to tell you is that
> the evidence is the facts in the record.  The
> jury is entitled to draw inferences from the
> evidence.   On  the  other  hand  you  can't
> speculate.   If  any  argument  made  by  either
> lawyer  you  believe  is  based  on  facts  in  the
> record  and  reasonable  inferences  from  the
> record, then you can accept it.  If it's pure
> speculation  for  example,  you  cannot  accept
> that argument."

(Id.)   The prosecutor continued, "[t]here's no way [the license

plate] was going to come back to match that car because it would

make it too easy to trace." (Tr. 377.)   After the court overruled

an objection to that statement, the prosecutor added, "[d]on't let

the fact that this was a well thought-out crime and some time and

effort was put into it . . . make you disregard the testimony from

Louis Champagne.   Nobody would rob a store using a traceable car

with  a  traceable  license  plate." (Tr.  378.)    The  court  then

sustained  an  objection  and  struck  the  last  sentence,  beginning

"nobody would." (See id.)

    In the final jury charge, the court instructed the jurors that

their verdict must be based on "the evidence or lack of evidence,"

and reminded the jurors that, in regard to an attorney's argument,

"if there's no fact in the record to support a particular inference

then you obviously can't adopt the conclusion of the inference.  In

addition,  you  cannot  speculate  as  to  things  that  are  not  in

evidence . . . ." (Tr. 388-89.)  In the jury charge, the court then

specifically addressed the prosecutor's comments about the license

plate: "[T]here was reference to perhaps the license plate was switched or there was a stolen plate involved or stolen car.  I just want to admonish you, this defendant or the others, no one is charged with possession of stolen license plates or stolen car[s]. That argument was allowed by me only to answer [Petitioner's] argument about the reliability of the witness's recitation of the license plate in question . . . ." (Tr. 416.)

In reviewing Petitioner's claim, the Appellate Division found that the summation was not unduly prejudicial because "[t]he challenged portion of the prosecutor's summation drew a reasonable inference from the evidence, in fair response to a defense argument, and was not unduly speculative." People v. Johnson, 306 A.D.2d at 215, 761 N.Y.S.2d at 230 (internal citations omitted). This Court is unable to conclude that the state court's determination was an unreasonable application of Supreme Court precedent.

A habeas petitioner claiming prosecutorial misconduct must show that the prosecutor has engaged in "egregious misconduct" amounting to a violation of the petitioner's due process rights. See Donnelly v. DeChristoforo, 416 U.S. 637, 647-48, 94 S. Ct. 1868, 1873-74 (1974); Miranda v. Bennett, 322 F.3d 171, 180 (2d Cir. 2003).  Improper remarks will constitute a denial of due process only when they cause "substantial prejudice" by "so infecting the trial with unfairness as to make the resulting

conviction a denial of due process." United States v. Elias, 285 F.3d 183, 190 (2d Cir. 2002) (quoting Darden v. Wainwright, 477 U.S. 168, 181, 106 S. Ct. 2464, 2471 (1986)).  "It is not enough that the prosecutor's remarks were undesirable or even universally condemned." Darden, 477 U.S. at 181, 106 S. Ct. at 2471.  To be entitled to relief, a petitioner must demonstrate that he "suffered actual prejudice because the prosecutor's comments . . . had a substantial and injurious effect or influence in determining the jury's verdict." See Tankleff v. Senkowski, 135 F.3d 235, 252 (2d Cir. 1998) (quoting Bentley v. Scully, 41 F.3d 818, 823 (2d Cir. 1994)).

To determine whether there was substantial prejudice, this Court must view the challenged remarks in the context of the entire trial.  See Greer v. Miller, 483 U.S. 756, 766, 107 S. Ct. 3102, 3109 (1987) (quoting Darden, 477 U.S. at 179, 106 S. Ct. at 2470); United States v. Thomas, 377 F.3d 232, 244 (2d Cir. 2004); Blissett v. Lefevre, 924 F.2d 434, 440 (2d Cir. 1991).  In doing so, the Court will consider "[t]he severity of the misconduct, any curative measures taken by the trial court, and the likelihood of conviction absent the challenged conduct." United States v. Newton, 369 F.3d 659, 680 (2d Cir. 2004).  Taking these factors into account, the prosecutor's summation did not render Petitioner's trial fundamentally unfair.

As a general matter, a prosecutor is allowed wide latitude in

his summation. See United States v. Tocco, 135 F.3d 116, 130 (2d
Cir. 1998) ("The prosecution and the defense are generally entitled
to wide latitude during closing arguments, so long as they do not
misstate the evidence.").  In addition, the prosecutor's comments
must be evaluated in light of the defense argument that preceded
it. See Darden, 477 U.S. at 179, 106 S. Ct. at 2470; Concepcion v.
Portuondo, No. 97 Civ. 3183 (JGK), 1999 WL 604951, at *5 (S.D.N.Y.
Aug. 10, 1999).   Where defense counsel has questioned the
credibility of the witnesses, a prosecutor is allowed to respond
accordingly. See United States v. Germosen, 139 F.3d 120, 129 (2d
Cir. 1998) (where defense summation assailed witnesses'
credibility, it was not improper for the prosecutor in his
summation also to comment on witnesses' credibility); Montero v.
Sabourin, No. 02 Civ. 8666 (RWS), 2003 WL 21012072, at *7 (S.D.N.Y.
May 5, 2003)(finding that prosecutor's remarks were not improper
because they responded to attacks by defense counsel on witnesses'
credibility).  Moreover, "[p]rosecutors have greater leeway in
commenting on the credibility of their witnesses when the defense
has attacked that credibility." United States v. Perez, 144 F.3d
204, 210 (2d Cir. 1998); see also United States v. Feliciano, 223
F.3d 102, 123 (2d Cir. 2000) (where prosecutor allegedly made
improper statements on summation in response to defense counsel's
attacks on credibility of government witnesses, court noted that
"[w]hen [] defense counsel [has] attacked the prosecutor's

credibility or the credibility of the government's agents, the prosecutor is entitled to reply with 'rebutting language suitable to the occasion'" (quoting United States v. Thai, 29 F.3d 785, 807 (2d Cir. 1994))); United States v. Wilner, 523 F.2d 68, 74 (2d Cir. 1975) ("A prosecuting attorney is not an automaton whose role in summation is limited to parroting facts already before the jury.").

In the instant case, Petitioner's counsel attacked the credibility of the prosecution's witness, attempting to argue that the lack of synchrony between the car's license plate number and description was proof that Champagne was not reliable, and hence his identification of Petitioner could not be trusted either. In response, instead of an error by Champagne, the prosecutor attempted to show the jury that there were alternative explanations as to why the car's license plate number and description did not match up. To be sure, the prosecutor posited a theory that required the jury to speculate, but the Court cannot say that the prosecutor exceeded those bounds to the point of causing Petitioner substantial prejudice.[10]

---

[10] The Court also acknowledges the concern that the prosecutor's insinuations prejudiced Petitioner by accusing him of an additional crime for which he had not been charged. However, the prosecutor was not suggesting that Petitioner had killed, tortured or even beaten someone. In the context of a trial for first and second degree robbery, the suggestion that Petitioner may have stolen a license plate as part of a scheme to rob eyeglass stores is not prejudicial to any significant degree. Nor did the prosecutor raise the point to attack Petitioner's character by painting him as a serial or depraved criminal. In fact, taken in context, the prosecutor's comments were rather benign. As such, the prosecutor's statements on summation were

_____Second, even where a prosecutor's summation comes "perilously close to testimony," there is no due process violation if the trial court sustains objections, strikes offending comments, and issues appropriate curative instructions in response. <u>Feliciano</u>, 223 F.3d at 123.   In the instant case, the trial court appropriately mitigated any prejudice stemming from the prosecutor's statements. As noted, when the prosecutor first suggested that Petitioner "most likely . . . took that license plate off another car" (Tr. 376-77), the court sustained defense counsel's objection and immediately instructed the jury that "the evidence is the facts in the record," and that "you can't speculate" (Tr. 377).  Additionally, the court advised the jury that "any argument made by either lawyer you believe is based on facts in the record and reasonable inferences from the record, then you can accept it.  If it's pure speculation . . . you cannot accept [it]." (Id.)  When the prosecutor later insinuated that "[n]obody would rob a store using a traceable car with a traceable plate," the court immediately sustained another objection and struck the statement. (See Tr. 378.)  Then, in its charge to the jury, the court noted again that the evidence in the record, not the arguments of counsel, controlled their verdict:

> In other words if an attorney said during one
> of the summations that something is in the
> record, if there's a fact in the record and
> you can draw a reasonable inference from that
> fact you may do that and you may accept that

_____

not prejudicial in such a way as to call into question the
fairness of the entire trial.

> argument as your own. On the other hand if
> there's no fact in the record to support a
> particular inference then you obviously can't
> adopt the conclusion or the inference. In
> addition you cannot speculate as to things
> that are not in evidence but you can draw
> reasonable inferences from facts that are in
> the record.

(Tr. 388-89.)

So, in each of the two instances where the prosecutor clearly
insinuated that the Petitioner stole a license plate, the court
immediately sustained an objection, and either struck the statement
from the record or instructed the jury to ignore speculation. In
addition, the court specifically addressed the prosecutor's
comments, clarifying what was in the record and providing guidance
to the jury as to the limited purpose for which the comments could
be considered:

> There was some reference made in the course of
> summations about the license plate and the car
> . . . . I just want to admonish you, this
> defendant or the others, no one is charged
> with possession of stolen license plates or
> stolen car[s]. That argument was allowed by
> me only to answer [Petitioner's] argument
> about the reliability of the witness's
> recitation of the license plate in question on
> September 8th.

(Tr. 416.)

In sum, the trial court's actions ensured that Petitioner's
trial remained fair. In addition to sustaining defense counsel's
objections, the court's instructions to the jury directly
addressing the prosecution's comments regarding the license plate

48

further ensured that Petitioner did not suffer substantial prejudice. See <u>Feliciano</u>, 223 F.3d at 123-24 (finding that trial court appropriately mitigated any potential prejudice from prosecutor's summation by informing jurors that their "recollection and interpretation of the evidence," and not "[w]hat the lawyers say," controlled their verdict); <u>Montero</u>, 2003 WL 21012072, at *8 ("[T]he trial judge sustained objections to comments made by the prosecutor, and where appropriate, struck the comments from the record.  The trial judge . . . properly instructed the jury that statements made in summation were not evidence.") (citations omitted); <u>Ramirez v. Miller</u>, 2005 WL 659144, at *6 (finding no due process violation where prosecutor misstated a particular legal standard, but the trial court "properly instructed the jury on the law"); <u>Peakes v. Spitzer</u>, No. 04 Civ. 1342 (RMB) (AJP), 2004 WL 1366056, at *19 & n.30 (S.D.N.Y. June 16, 2004) (Report and Recommendation, adopted on July 23, 2004) (citing cases reflecting mitigating effect of proper trial court instructions, even where prosecutor's summation contained clear error); <u>Trueluck v. Phillips</u>, No. 03 Civ. 904 (RMB) (JCF), 2003 WL 22390113, at *5 (S.D.N.Y. Oct. 20, 2003) ("Even if the prosecutor's remarks could be construed as misstating the law, any possible misconception was corrected by the court's subsequent charge.")

Accordingly, Petitioner's due process claim regarding the prosecutor's alleged misconduct during summation should be

dismissed.

V.    Brady Claim

Petitioner claims that the prosecution violated his rights under Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963), by withholding evidence of information relating to Petitioner's commission of a grand larceny in Brooklyn on the same date and time as the September 8, 1998 robbery of Cohen's Fashion Optical. (See Petitioner's § 440.10 Motion, Ex. J to Resp't Decl., at 9-11.) Respondent's interpret Petitioner's amended Petition to include two additional Brady claims: 1) descriptions of the perpetrator made by eyewitnesses Barbara Hertz ("Hertz") and Marlene Dorfman ("Dorfman") that were inconsistent with Petitioner's physical characteristics were withheld, and 2) Petitioner was precluded from presenting alibi testimony from his girlfriend because of the prosecutor's plan to call rebuttal witnesses if she were to testify. (See Resp't Mem., at 45-46.)  In the Court's view, these claims are ancillary, used merely to support Petitioner's central claim under Brady that exculpatory documents relating to his participation in a grand larceny in Brooklyn were withheld. Nevertheless, out of an abundance of caution, the Court will consider these arguments separately.  Upon doing so, the Court concludes that all of Petitioner's claims are belied by the record, and fail to demonstrate that the state court's application of Brady was unreasonable.

To establish a federal constitutional violation under <u>Brady</u>, a petitioner must show that the state withheld evidence that was material and exculpatory, and that, as a result of the alleged violation, the petitioner's trial lacked fundamental fairness. See United States v. Gil, 297 F.3d 93, 101 (2d Cir. 2002); United States v. Coppa, 267 F.3d 132, 139 (2d Cir. 2001) (citing Kyles v. Whitley, 514 U.S. 419, 435, 115 S. Ct. 1555 (1995)). Under <u>Brady</u>, the government violates due process when it fails to produce evidence favorable to the accused that is material either to guilt or to punishment. <u>See</u> <u>Brady</u>, 373 U.S. at 87, 83 S. Ct. at 1196-97. Evidence is favorable if it tends to show that the accused is not guilty or if it impeaches a prosecution witness. <u>See</u> <u>United States v. Bagley</u>, 473 U.S. 667, 674, 105 S. Ct. 3375, 3379 (1985); <u>Boyette v. Lefevre</u>, 246 F.3d 76, 90 (2d Cir. 2001). Evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." <u>Bagley</u>, 473 U.S. at 682, 105 S. Ct. at 3383; <u>accord</u> <u>Kyles v. Whitley</u>, 514 U.S. 419, 432, 115 S. Ct. 1555, 1565 (1995); <u>see also</u> <u>Boyette</u>, 246 F.3d at 91; <u>Chacko v. United States</u>, Nos. 96 Cr. 519(JGK), 00 Civ. 405 (JGK), 2000 WL 1808662, at *4 (S.D.N.Y. Dec. 11, 2000). Thus, "[to] establish a <u>Brady</u> violation, the petitioner must show (1) that the evidence at issue is favorable to the accused, either because it is exculpatory or impeaching; (2) that the government suppressed the evidence, either

willfully or inadvertently; and (3) that prejudice ensued." <u>Chacko</u>, 2000 WL 1808662, at *4 (citing <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 1948 (1999)); <u>see also</u> <u>Boyette</u>, 246 F.3d at 89.  Such prejudice is necessary in order to satisfy the "material" requirement in <u>Brady</u>. <u>See</u> <u>Strickler</u>, 527 U.S. at 282, 119 S. Ct. at 1949.  Taking them separately, each of Petitioner's <u>Brady</u> claims fails on some or all parts of the test.

    A.   <u>Petitioner's Alleged Brooklyn Larceny</u>

First, Petitioner argues that the prosecution improperly withheld evidence that he had been committing a separate grand larceny in Brooklyn at nearly the same time as the Cohen's Fashion Optical robbery, proving that he could not have committed the two Manhattan robberies for which he was convicted.  As an initial matter, it is not clear that evidence of Petitioner's commission of the robbery in Brooklyn would be exculpatory in nature.  Petitioner was never charged with the commission of a robbery in Brooklyn on September 8, 1998, the day of the Cohen's Fashion Optical robbery. The purported exculpatory evidence consists of an "ECAB" write-up sheet regarding the Brooklyn incident, prepared by an Assistant District Attorney, in which Kerry Crumble, Petitioner's brother, denied stealing jewelry.  He stated that, "the other guy snatched the jewelry. . . . The other guy is my brother, Johnson." (Pet'r 440.10 Mot., Ex. J to Resp't Decl., at subpart E.)  Even were this to be true, the Brooklyn incident occurred approximately thirty

minutes before the robbery of Cohen's Optical, so it is possible that Petitioner could have driven to Manhattan in time to commit the second robbery.   In fact, the evidence shows that the perpetrators in the Cohen's Fashion Optical robbery fled in an automobile.  With that in mind, the ECAB report could be seen as more incriminating than exculpatory; after all, Kerry Crumble goes on to say that "[my brother and I] steal in a group with another guy.  We stole sunglasses and Armani shirts in Manhattan." (Id.)

Regardless, it cannot be said that evidence of Petitioner's involvement in the Brooklyn robbery was improperly withheld, or that any failure to disclose such evidence would have been prejudicial.  Respondent denies the allegation that the prosecutor, a Manhattan District Attorney, was aware of the investigation into a grand larceny committed in the 79th Precinct in Brooklyn. Petitioner presents no convincing evidence to the contrary.[11]  Cf. Franza v. Stinson, 58 F. Supp. 2d 124, 154 (S.D.N.Y. 1999) ("[The petitioner's] claim of withheld Brady material is speculative,

---

[11] Petitioner's claim is that the District Attorney's Office in Manhattan knew about the grand larceny in Brooklyn because of its contact with Detective Fonteboa, a Brooklyn police officer. However, Detective Fonteboa, an officer in the 90th Precinct, was looking for Petitioner as a suspect in a crime unrelated to either the Brooklyn or Manhattan grand larcenies. (See Respondent's Opposition to C.P.L. § 440.10 Motion, dated May 19, 2005 ("Resp't 440.10 Opp."), Ex. K to Resp't Decl., at 6; Pet'r 440.10 Mot., Ex. J to Resp't Decl., at subpart E (identifying Lt. Brown of 79th Precinct as officer to whom Kerry Crumble made statements).)  There is no evidence that Detective Fonteboa — an officer in the 90th Precinct — knew about a grand larceny that took place in the 79th Precinct, in which Kerry Crumble — not Petitioner — was arrested.

conclusory and unsupported, and thus must be rejected."). Even had the prosecutor known of Petitioner's alleged participation in the Brooklyn grand larceny, the suppression of such evidence could not be prejudicial where Petitioner assuredly would have been aware of his own involvement in a nearly concurrent robbery. While it is true that statements by Petitioner's brother would have provided additional evidence, Petitioner surely did not need to rely on the prosecution to turn over documents in order to establish this alibi theory, and was independently capable of investigating the existence of such documents. Thus, Petitioner's claim regarding the Brooklyn robbery fails to meet all three parts of <u>Brady's</u> materiality test.

### B.   <u>Contrary Identification by Hertz and Dorfman</u>

In the interests of justice, and construing Petitioner's <u>pro se</u> habeas petition liberally, the Court considers Respondent's interpretation of Petitioner's habeas application to include an additional claim under <u>Brady</u>, alleging that detectives' notes were withheld in which Hertz and Dorfman each described one of the perpetrators as wearing cornrows and standing over six feet tall. (Pet'r 440.10 Mot., Ex. J to Resp't Decl., at 9-10, subparts G, I.) Considering that Petitioner is 5'4" and 130 pounds, these descriptions would indeed be exculpatory in nature. However, there is no basis to conclude from the record that evidence of these descriptions was withheld from Petitioner. Respondent asserted in

opposition to Petitioner's § 440 motion that the detectives' notes recording their conversations with Hertz and Dorfman, including the witnesses' descriptions of Petitioner (as the third perpetrator, or lookout, in the Cohen's Fashion Optical robberies), were provided to Petitioner's counsel prior to the suppression hearing and trial. (See Resp't 440.10 Opp., Ex. K to Resp't Decl., at 6.)  Petitioner, in fact, attached to his motion copies of the detectives' written and typed notes containing Hertz and Dorfman's descriptions. (Pet'r 440.10 Mot., Ex. J to Resp't Decl., at subpart G, I.)  Moreover, Petitioner's counsel conceded as much at trial.  At least in regard to Hertz, Petitioner's counsel cross-examined Detective White regarding Hertz's description, asking him whether "Miss Hertz is the one who told you that one of the robbers who had cornrows was over six feet tall. . . . " (Tr. 275.)  When the detective stated that he "didn't have Miss Hertz's interview sheet with [him] . . .," Petitioner's counsel responded, "I've got the DD5."[12] (<u>Id.</u>)  At least with regard to Hertz, not only was her contrary identification not withheld, it was used by Petitioner's counsel at trial.

Even were it the case that evidence of Hertz and Dorfman's contrary identifications was actually withheld, there is no reasonable probability that the result at trial would have been

---

[12] Based on the record, "DD5" appears to refer to an officer's typed investigation notes from a conversation with a witness.

different.  Here, not only did Petitioner's counsel bring out the fact that Hertz described the individual in cornrows as being over six feet tall, Petitioner's counsel focused repeatedly during cross-examination and summation on the inaccuracy of the descriptions provided by the prosecution's two eyewitnesses, Martell and Champagne. (See Tr. 62-63, 129-130, 327, 328-29, 340-42.)  Any additional testimony elicited at trial showing that Plaintiff was actually 5'4" and 130 pounds, not over six feet tall, would likely have had minimal incremental benefit.  Consequently, the state court's finding that there was no material withholding of exculpatory evidence based on contrary identifications by Hertz and Dorfman was not contrary to, nor an unreasonable application of, the Brady standard.

C.   Alleged Preclusion of Petitioner's Girlfriend's Alibi
     Testimony

Finally, the Court considers the claim, as understood by Respondent, that under Brady, the prosecutor improperly precluded Petitioner from calling Denise Johnson as an alibi witness at trial.  To further articulate the claim, the argument appears to be that the prosecutor informed Petitioner's counsel that, were he to call Petitioner's girlfriend, the prosecutor would call Detectives White and Fonteboa as rebuttal witnesses to state that Petitioner's girlfriend had previously told them that she had not seen Petitioner in months. (See Pet'r 440.10 Mot., Ex. J to Resp't

56

Decl., at 6, 11; Resp't 440.10 Opp., Ex. K to Resp't Decl., at 7.)

Petitioner's argument simply cannot be classified as a <u>Brady</u> claim, nor does it constitute a constitutional violation subject to habeas review. As such, it is meritless. The prosecution's intention to call rebuttal witnesses to contradict potential alibi testimony from Petitioner's girlfriend cannot be understood as the suppression of exculpatory evidence. Indeed, it appears that Petitioner's complaint here is not that information was *withheld*, but rather that information was *given*. As such, it does not fit within the purview of <u>Brady</u>.

In reality, the prosecutor did not withhold evidence; instead, she presented defense counsel with information that allowed him to make a more informed, tactical decision as to whether he should call Petitioner's girlfriend at trial. In the end, through his attorney, Petitioner made a strategic decision not to call her. (<u>See</u> Petitioner's Reply Answer to Respondent's Opposition to C.P.L. § 440.10 Motion, Ex. L to Resp't Decl., at subpart N) (letter to Petitioner from his trial counsel, stating that he had decided not to call Petitioner's girlfriend, a decision in which Petitioner concurred, because "[g]iven her statement to the police it would be difficult for the jury to accept her testimony…..")

As each of Petitioner's claims have failed to meet the requirements of the <u>Brady</u> standard, they should be dismissed.

VI. <u>Grand Jury Claim</u>

57

Finally, Petitioner argues that, in violation of his due process rights, "the prosecutor knowingly present[ed] false testimony before the grand jury and failed to cure the defect." (Leave to Amend and Memorandum Endorsed Order, Ex. P to Resp't Decl., at 1.) Specifically, he argues that Louis Champagne falsely testified before the grand jury that, during the robbery of Cohen's Fashion Optical, Petitioner was the individual who helped Antonio Campbell grab the glasses (the second perpetrator).[13]   However, in a previous grand jury proceeding involving Cecilio Cross, Champagne had identified Cross as the second perpetrator.   At trial, Champagne testified that he had incorrectly described Petitioner's role before the grand jury and that he was "positively sure" that Petitioner was actually the third perpetrator, acting as a lookout. (See Tr. 116, 120-27, 133-35, 138-39, 140-42, 160-61.)

Petitioner first raised the grand jury claim on direct appeal, in his pro se supplemental brief.   The Appellate Division "considered and rejected" Petitioner's claims, see People v. Johnson, 306 A.D.2d at 216, 761 N.Y.S.2d at 230, resulting in an adjudication on the merits subject to AEDPA deference.   With this in mind, the Court finds that the state court's determination is not contrary to, nor an unreasonable application of, clearly established Supreme Court law.

_____

[13] Champagne had always asserted that there were three individuals involved in the robbery, the first two who actually grabbed sunglasses and a third who entered afterward and served as a "lookout."

As a general rule, a jury conviction transforms any defect connected with the grand jury's charging decision into harmless error, because the trial conviction establishes not only probable cause to indict, but also proof of guilt beyond a reasonable doubt. See United States v. Mechanik, 475 U.S. 66, 70, 106 S. Ct. 938, 942 (1986); United States v. Eltayib, 88 F.3d 157, 173 (2d Cir. 1996) (dismissing petitioner's grand jury related claim "[i]n light of the Supreme Court's pronouncement that a guilty verdict by a petit jury remedies any possible defects in the grand jury indictment"); Lopez v. Riley, 865 F.2d 30, 32 (2d Cir. 1989) ("If federal grand jury rights are not cognizable on direct appeal where rendered harmless by a petit jury, similar claims concerning a state grand jury proceeding are a fortiori foreclosed in a collateral attack brought in a federal court."); Crawford v. Williams, No. 02 Civ. 2897 (RMB), 2003 WL 21344539, at *2 (S.D.N.Y June 10, 2003)(petitioner's claim of a defective grand jury indictment "became moot upon the petitioner's conviction at trial based upon the jury's finding him guilty beyond a reasonable doubt"); Figueroa v. Donnelly, No. 02 Civ. 6259 (NRB), 2003 WL 21146651, at *8 (S.D.N.Y. May 16, 2003) ("It has been consistently held that claims of error in a state grand jury proceeding are not cognizable for federal habeas corpus review after a petit jury has convicted the petitioner."); Barber v. Garvin, No. 99 Civ. 88 (JSM), 2000 WL 423639, at *1 (S.D.N.Y. Apr. 19, 2000) (claim that there was

insufficient evidence to indict is not cognizable on federal habeas corpus review); <u>Roberts v. Scully</u>, 875 F. Supp. 182, 185 n.1 (S.D.N.Y. 1995), <u>aff'd</u>, 71 F.3d 406 (2d Cir. 1996) ("[E]ven were the court to overlook the procedural bar, it would still dismiss petitioner's indictment-related claims on their merits" because insufficiency of indictment is not a basis for habeas relief); <u>cf.</u> <u>United States v. Gibson</u>, Nos. 91 Cr. 669 & No. 94 Civ. 626 (PNL), 1994 WL 88619, at *1 (S.D.N.Y. Mar. 11, 1994)("[E]ven if [a witness's] grand jury testimony had been perjurious and it somehow tainted the indictment, that is of no consequence now that the petitioner has been convicted after trial.").

At trial, Petitioner's counsel cross-examined Champagne extensively regarding his contradictory testimony. (See Tr. 120-27, 133-35, 138-39, 140-42.) Nevertheless, Petitioner was found guilty beyond a reasonable doubt. The fact that Petitioner here was able to fully air this issue before the jury only bolsters the Supreme Court's general rule that, after conviction, grand jury errors are harmless.

Moreover, in the instant case, Petitioner has not even established that Champagne's contradictory testimony constituted perjury, <u>see United States v. Bortnovsky</u>, 879 F.2d 30, 33 (2d Cir. 1989) (holding that a witness who recants or contradicts his prior testimony does not commit perjury; witness credibility is for jury to decide), or that it "warrant[s] the inference that the

government knowingly introduced perjurious testimony" <u>Charleston v. Senkowski</u>, No. 92 Civ. 6639 (MGC), 1994 WL 617373, at *7 (S.D.N.Y. Nov. 07, 1994).   Champagne's acknowledged erroneous testimony before the grand jury was "at most a point for the defense counsel to place before the jury for its resolution," which is exactly what happened here. <u>Bortnovsky</u>, 879 F.2d at 33.[14]

For the foregoing reasons, the Court cannot say that the New York court's rejection of Petitioner's grand jury claim was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court.   Thus, the Court respectfully recommends that this claim be dismissed.

## CONCLUSION

For the reasons set forth above, this Court respectfully recommends that the Petition be dismissed with prejudice.   Further, because Petitioner has not made a substantial showing of a denial of a federal right, this Court recommends that no certificate of appealability be issued.   <u>See</u> 28 U.S.C. § 2253(c)(2); <u>Lucidore v.</u>

---

[14] Similarly, Petitioner's claim that the prosecution knowingly presented false testimony before the grand jury is meritless.   Under New York law, a motion to dismiss the indictment may be granted if the grand jury proceeding was defective to such a degree that the integrity of the proceeding is impaired, and prejudice to the defendant may result. <u>See</u> New York C.P.L. § 210.20(c) and § 210.35(5) (McKinney 1993).   Here, there is no evidence that the prosecutor acted knowingly or willfully.   In fact, upon learning of the grand jury witness' misidentification of Petitioner's role in one of the robberies, the prosecutor informed both the court and defense counsel. (<u>See</u> Resp't 440.10 Opp., Ex. K to Resp't Decl., at 4.)

N.Y. State Div. of Parole, 209 F.3d 107, 112 (2d Cir. 2000).  I further recommend that the Court certify pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from its order would not be taken in good faith.  See Coppedge v. United States, 369 U.S. 438, 445-46, 82 S. Ct. 917, 921 (1962).

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this report to file written objections.  See also Fed. R. Civ. P. 6(a) and (e).  Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Harold Baer, United States District Judge, and to the chambers of the undersigned, Room 1660.  Any requests for an extension of time for filing objections must be directed to Judge Baer.  Failure to file objections will result in a waiver of those objections for purposes of appeal.  Thomas v. Arn, 474 U.S. 140, 155, 106 S. Ct. 466, 475 (1985); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989).

Respectfully Submitted,

THEODORE H. KATZ
UNITED STATES MAGISTRATE JUDGE

Dated: November 1, 2006
       New York, New York

Copies mailed to:

Kevin Johnson
99-A-7151
Mid-State Correctional Facility
P.O. Box 2500
Marcy, New York 13403

Ashlyn Dannelly, Esq.
Assistant Attorney General
120 Broadway
New York, New York 10271